## UNITED STATES v. ROCHA.

1  The eleventh section of the act of March 3d, 1851, to ascertain and settle private land claims in California (9 Stat. at Large, 631), provides that the commissioners created under the act, and the District and Supreme Courts, "in deciding on the validity of any claim brought before them under the provisions of the act, shall be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of the United States, so far as they are applicable."   An appeal from a decree of the com-missioners rejecting a claim having been made to the District Court, and there dismissed for want of prosecution, leave to file a bill of review upon newly discovered evidence was granted by that court: Held, that though the provision of the eleventh section refers to the rules to be observed by the courts in passing upon the merits of the claimant's right,.or title to the land, the liberal and equitable principles there enjoined as a duty in the decision of cases, cannot be fully or fairly carried out without giving to them application and effect in conduct-ing the proceedings before the courts as well as in passing upon the merits; and that to this end the court possessed the power to open a case for the purpose of hearing newly discovered evidence upon the title of the claimant.

---

* The Grace Girdler, 7 Wallace, 201.                    † Ib.

2. In 1828 certain parties petitioned the authorities of the pueblo of Los Angeles, in California, for a grant of a tract of land, erroneously supposed, at the time, to be within the limits of the pueblo; the grant was made, and under it the grantees took possession of the premises, and they, or their representatives, continued to occupy them until the presentation of the claim to the board of land commissioners, under the act of Congress of March 3d, 1851. In 1840 the widow of one of the grantees presented a petition to the prefect of the district soliciting the land, and reciting that the land had been ceded provisionally to her deceased husband. The prefect referred the petition to a justice of the peace, at Los Angeles, for information in respect to the petition and the petitioner ; the justice reported that there was no objection to a concession of the land to her ; and the prefect then communicated to the governor of the department the petition of the widow, and advised him that there was no objection to the granting of the petition. The governor thereupon decreed that all the places ceded for ranchos in that jurisdic tion should remain as provisional grants until the ejidos (common lands) of the city should be regulated. *Held*, that under this decree of the governor the widow and her children took the title provisionally, that is, if the tract fell within the limits of the town-land, when they were ascertained, it should be inoperative; but if outside these limits, the title should become absolute.

APPEAL from the District Court of the United States for the Southern District of California.

This case involved the right to one league of land in the county of Los Angeles, California, claimed by the children and grandchildren of Antonio José Rocha, an early settler in the pueblo of Los Angeles, where he long exercised the art of smithing. The land was called *La Brea*, which is the Spanish word for pitch or bitumen, and this name was given the rancho because it contained a large asphaltum spring, which added much to its value. From this fact the rancho was easily identified, and it had been well known by one name for more than forty years.

On the 6th of January, A.D. 1828, Rocha and one Dominguez petitioned the ayuntamiento or town council of the pueblo of Los Angeles for a grant of this place, called Ranch De La Brea. On the 8th of April, 1828, the petition was granted by the ayuntamiento, and the title was issued in the following form, indorsed upon the petition :

" **The parties** interested in this petition can build their cor-

rals, place their stock, make their fields in the lands which they have signified, on the same terms, conditions, and circumstances as the other citizens have done who have received such a favor, being responsible for care, and only to report any crime which they may notice within their boundaries.

" CARILLO."

This is the usual form of a municipal grant for the *ejidos* and *proprios* of a town.

It was not now asserted that this concession vested a valid title in the petitioners, although they at the time believed it did. The land proved to be outside of the limits of this pueblo. For many years it was supposed by the inhabitants and municipal authorities of the pueblos of California that each town was entitled to sixteen square leagues, or four leagues square, of land. The quantity of land to which a pueblo was actually entitled under the laws of Spain and Mexico was four square leagues, and no more.*

In an order of Pedro Nava, dated June 21st, 1791, at Chihuahua, reference was made to the foregoing laws as to the quantity of land which a pueblo should take, and the law is ambiguously stated as follows:

" The extent of four leagues, measured from the centre of the plaza (square) of the presidio (garrison), in each direction."

The mistake of Nava was subsequently followed in several orders and decrees of the governors of California, issued in relation to the pueblo lands. Hence the general impression that a town was entitled to sixteen square leagues. Carillo, the president of the ayuntamiento, who signed the grant under consideration, testified that the land was considered at the time as belonging to the town, and that before the grant *it was occupied by the town*. The city of Los Angeles, in its petition to the late board of land commissioners, claimed sixteen square leagues, and prayed confirmation for

---

* Decree of Philip II, Laws of the Indies, book 4, title 5, law 6, ordinance Philip II; Recopilacion, 'aw 10, book 4, title 5; Opinion of Galindo Navarro, Assessor-General, June 21st, 1786.

that q1antity. Much proof was taken to support that theory, but it was subsequently ascertained that the true quantity was four square leagues, for which a decree was entered and a patent subsequently issued. Indeed, even now the inhabitants of Los Angeles were in the habit of speaking of the old pueblo lines and the new pueblo lines. The land in question was situated within the sixteen square leagues claimed, but without the four leagues patented.

On the 13th of April, A.D. 1840, Maria Josefa, the widow of Rocha, who in the meantime had died, petitioned the prefect of the second district, reciting that the place called "La Brea" was ceded provisionally to her husband in 1828, from which time it had been occupied by his family, and praying for a definitive grant of the same. On the next day the prefect referred this petition to the justice of the peace for information, and on the 28th of the same month the justice reported favorably to the grant, stating that he had gone with two witnesses to examine the land, found the diseño or map to be in conformity with the petition, and that the petitioner had the proper quantity of stock to occupy the land. On the 2d of May, 1840, the prefect of the second district recommended to the governor that the prayer of the petitioner be granted, assigning as a cause that the petitioner was a widow having charge of a family; and on the 10th of May the prefect issued and delivered to the petitioner a certificate, as follows, countersigned by his secretary:

"In conformity with the disposition of his excellency the senor governor, communicated to this prefecture in a note of the 27th of April last, with respect to that resolution of the excellent departmental junta, all of the places ceded for ranchos of this jurisdiction will remain of the character of provisional until the ejidos of the city shall be regulated. I have made known the said superior disposition to the interested party to this petition, and she remains informed."

The expediente of these proceedings was found in the archives, "Departmental State Papers, Angeles, Miscellaneous," vol. xii.

From some cause or other doubt arose in the mind of the widow of Rocha as to whether the title issued to her husband by the city of Los Angeles was sufficient. This appeared from the fact that she terms it " provisional," though it was not more so than other municipal grants. She therefore instituted the proceedings stated above before the prefect for a more formal concession. Usually, proceedings for a grant of land under the colonization laws were begun by presenting a petition to the governor, who referred the petition to some of the local authorities for information. Sometimes, however, when the lands were situated and the parties lived at a great distance from the seat of government,* the preliminary proceedings were begun before a prefect, who made the usual reference for report, received the same, and then transmitted all the papers to the governor for his action. That was the course pursued in this case, and was in strict conformity to the following decree, the original of which was on file in the office of the surveyor-general of the United States at San Francisco :

" Juan Bautista Alvarado, governor, *ad interim*, of the department of the California, to the inhabitants thereof: Know ye, That it being important that the public business of the department may be promptly dispatched, I have thought proper to decree as follows :

" 1st. All those who make petitions in relation to lands, or others of this nature, will direct the same to the prefects of the respective districts, who will make reports on said petitions.

" 2d. These expedientes shall be directed to the Secretary of State by the prefects. And that this may reach the notice of all, I order that this be published as a decree, and circulated in all the places of the department.

" Given in Monterey, at the governor's house, on the 7th of March, 1839.

" J. B. ALVARADO.

" MANUEL JIMENO,
   " Secretary."

---

* Monterey, the seat of government, was over four hundred miles from Los Angeles.

"OFFICE OF THE SECRETARY OF STATE.

" His Excellency, the governor, has ordered me to inform your honor, that at this date, there was issued to the subordinate authorities of the district under the charge of your honor, copies of the orders referred to; one of them being in relation to the division of the department into districts, in accordance with the resolution of the most excellent departmental junta; and others, that petitions for lands, and others of this class, shall be directed to the corresponding prefecturas; communicating them separately, and at the same rate, to the subaltern authorities, which in the future, shall be attended to directly by the officers referred to in the decree regulating the affairs of the department, of the date of March, 1837.  God and Liberty.

" MANUEL JIMENO.

" To the Prefect of the First District, Don José Castro.

" MONTEREY, March 11, 1839."

The governor, when he received the petition of the widow and the report of the prefect, was uncertain whether or not the land solicited was included within the limits of the town-lands or ejidos of Los Angeles; and for this reason he issued his decree in the form he did, that this, as well as all other places ceded for ranches within the jurisdiction of the second district, should remain as provisional grants until the ejidos of the city of Los Angeles should be regulated. The records showed that the city had made numerous grants in the form of the one issued to Rocha and Dominguez on the 8th of April, 1828.  The ejidos of Los Angeles were not marked out under the Mexican authorities, nor were they in fact ever defined, until surveyed by the surveyor-general of the United States, under the decree confirming four square leagues of land to the city.

The claimants relied, for confirmation of their claims before the board of land commissioners, upon the grant issued by the ayuntamiento (town council) of Los Angeles, and the long-continued possession of the grantees or their legal representatives thereunder, which was from the date of the grant.  The commissioners rejected the claim solely on the ground of the want of a sufficient description of the tract.

The board expressed no doubt as to the genuineness of the papers or the effect of them in the conveyance of a right to the tract. The decision was made in March, 1855. The parties appealed to the District Court, where an issue was made up in January, 1858, and in August, 1860, the appeal was dismissed for want of prosecution.

In February, 1861, a notice was given to the United States attorney of a motion to the court for a bill of review on newly discovered evidence, which was heard and granted in October, 1862. The newly discovered evidence was found among the Spanish or Mexican archives of the executive department, in the surveyor-general's office of California, where they were kept, according to law, upon a diligent search in September, 1860. Search had previously been made, but failed, as there was no indices to the volumes of these records. These documents consisted of the petition of the widow to the prefect, and the proceedings thereon, including the decree of the governor, which are set forth above.

On the 4th October, 1862, leave to file the bill of review was granted. It was subsequently filed, and an answer put in to the same, and leave granted to take further testimony. Four witnesses were examined on the part of the appellant, in addition to those examined before the commissioners; and, on 8th of December, 1864, the decree of dismissal was set aside, and the decision of the commissioners reversed, and the claim of the appellants confirmed. The testimony produced by the claimants showed that their ancestor entered into possession of the land claimed as early as April, 1828; and that the possession by the claimants and their ancestors had been continuous and uninterrupted from that time to the present, under claim of title from the government.

*Messrs. Brent and Wills, for the United States; Mr. C. Cole, contra.*

Mr. Justice NELSON delivered the opinion of the court.
Several objections are taken to the decree of the court be-

low. The first is, that this court had no power to grant the relief prayed for by a bill or petition of review. As we have seen, the cause was dismissed the 8th of August, 1860, for want of prosecution; and, on the 22d of February, 1861, some five months afterwards, notice was given for leave to file this petition, which was granted on the 4th of October, 1862, at a special term of the court, sitting at Los' Angeles. There was no great delay, therefore, in making the application for relief, founded on the newly discovered evidence. The ninth section of the act of March 3d, 1851,* for the settlement of California land claims, provides that the claimant, if he fails before the commissioners, may present a petition to the United States District Court praying the court to review the decision; and the tenth section, that the court shall proceed to render judgment upon the pleadings and evidence in the case, before the commissioners, and, upon such further evidence as may be taken by order of the court; the eleventh section, that the District Courts, and the Supreme Court on appeal, shall, "in deciding on the validity of any claim brought before them under the provisions of the act, be governed by the treaty of Guadaloupe Hidalgo, the law of nations, the laws, usages, and customs of the government from which the claim is derived, the principles of equity, and the decisions of the Supreme Court of the United States, so far as they are applicable."

This provision, doubtless, refers to the rules to be observed by the courts in passing upon the merits of the claimant's right or title to the land; but no one can avoid seeing, that the liberal and equitable principles thus enjoined as a duty in the decision of the cases, cannot be fully or fairly carried out, without giving to them a reasonable application and effect in conducting the proceedings before the courts as well as in passing upon the merits. And, regarding these principles in this light, we cannot agree that the court possessed no power to open the case for the purpose of hearing the newly discovered evidence. It is not important what

---

* 9 Stat. at Large, 631.

the proceedings are called, petition of review, or motion to set aside the decree dismissing the case for want of prosecution, for the purpose of letting in the new evidence. There had been no decree on the merits. The confusion and disorder that existed, in respect to the Spanish and Mexican archives at the close of the war, when the Mexican authorities hastily left the country, has been shown in several cases before this court; and some indulgence is due to an honest claimant as to the order and time in which to produce his evidence.

The next question, and the only remaining one, that it is material to notice, is whether the case presented to the court below justified the confirmation of the claim.

Antonio José Rocha and his legal representatives had been in the possession and occupation of the land in question, claiming title to the same, for a period of twenty-four years, when, in 1852, the petition was presented to the commissioners for confirmation. The representatives have since been in the possession and occupation, and in continued litigation to defend their rights, for the period of eighteen years, making an uninterrupted possession of forty-two years. The present appellees are the children and grandchildren of the original occupant of the tract as early as 1828. He was then a blacksmith by trade, and one of the most respectable and substantial settlers in the pueblo of Los Angeles. The first claim of title under which he took possession was a grant of the president of the ayuntamiento of this pueblo, dated April 8th, 1828. The document is in the usual form by which grants were made of pueblo lands. Carillo, the president, still living in Los Angeles, was examined before the commissioners, and verified the document as original and signed by him. The rancho La Brea was then, and long afterwards, supposed to belong to the pueblo, and, if so, the council of the city had the right to dispose of it. This right is recognized in the act of 1851 for settling these titles. Section fourteen enacts " that the provisions of this act shall not extend to any town-lot, farm-lot, or pasture-lot held under a grant from any corporation or town to which

lands may have been granted for the establishment of a town by the Spanish or Mexican governments." The section then provides that the claim for land embraced within the limits of the town may be presented to the commissioners by the corporate authorities.

It appears from the evidence that it was the general understanding and belief of the authorities of the city of Los Angeles, at the time, that the Rancho La Brea was situated within the limits of the city, and which was founded on an idea, which was prevalent, that a pueblo, according to Mexican laws, was entitled from the government to sixteen square leagues, whereas it was ultimately determined that it was entitled only to four, which left this ranch outside of the city limits. But this was not settled till after the cession to this government. The city of Los Angeles presented their petition before the commissioners for the confirmation of sixteen square leagues. Four only were confirmed.

Then, as to the second claim, founded on this newly discovered evidence. This is obtained from Governor Alvarado, in the year 1840. It is true that the formal papers were before Tiburcio Tapia, the prefect of the district, but authority had been conferred upon him by the governor. The authority was issued March 7th, 1839. It states, 1st, that persons presenting petitions for land shall direct the same to the prefects of the district, who will make report on them; 2d, these expedientes shall be directed to the Secretary of the State by the prefects.

The reason assigned was for the convenience of the people, most of whom resided at great distances from Monterey, the residence of the governor. The city of Los Angeles was over four hundred miles distant. The papers in the case conform strictly to this regulation. Objection is made that there was no proof of the signatures of the officials to the expediente; but the answer is, that no objection was made to it upon this ground in the court below; nor, indeed, does it appear that any objection was made to it as it respected the genuineness of the papers. The objection seems to have been founded on the legal effect of the instrument as a concession

of any title to the premises. The prefect had expressed his opinion to the governor that there was no objection to the grant of the land to the petitioner; but the governor, it would seem, being uncertain whether or not the tract might not lie within the limits of the town-lands, or ejidos of the city of Los Angeles, issued his decree that this as well as other neighboring tracts theretofore ceded for ranchos within the jurisdiction of the prefect of this district, should remain as provisional grants until the ejidos of the city should be ascertained. The prefect was directed to make this communication to the petitioner, which he did.

We think it clear, that the fair import and effect of this instrument, reading it in connection with the petition of the widow, that she and her children should take the titles provisionally, that is, if the tract fell within the limits of the town-land, when they were ascertained, it should be inoperative; but if outside these limits, the title should become absolute.

The petitioner had stated in her petition that she was the widow of Antonio Rocha; that the tract had been ceded to her husband, in 1828, provisionally; that it was about two leagues from the city of Los Angeles; that it was covered with cattle and horses, and that she desired it for the subsistence of her numerous family.

The ejidos were not ascertained during the existence of the Mexican government, as the disturbances broke out soon after this grant, which resulted in the war with this country and the cession of the lands. Since the peace, the limits belonging to the city have been defined under the direction of the surveyor-general of the United States, and the premises in question are not included within them. If this had taken place under the former government, it cannot, we think, be doubted but that under the Mexican laws and usages this title would have become perfect, and hence, under the treaty and act of Congress, it is the duty of this court so to hold. As we have seen, that treaty and act of Congress make it our duty to decide these cases " according to the law of nations, the laws, usages, and customs of the

government from which the claim is derived, the principles of equity, and the decisions of this court as far as applicable." Here the claimants and their ancestors have been in the uninterrupted possession and occupation approaching the period of half a century, having entered first under a pueblo grant, which at the time was supposed to be in pursuance of authority; and, second, was confirmed by a provisional grant from the Mexican governor, who possessed full authority, which, we think, fairly enough brings the case within the principles governing these cases.

DECREE AFFIRMED.

Mr. Justice CLIFFORD, with whom concurred Mr. Justice DAVIS, dissenting.

I dissent from the opinion and decree of the court in this case, for the following reasons:

1. Because the ayuntamiento of Los Angeles never possessed any authority to make such a grant, and it follows of course that the document purporting to be signed by the alcalde is null and void. Argument upon that topic is unnecessary, as the claimants admit that the proposition is correct.

2. Because the additional documents exhibited by the claimants in the District Court show conclusively, not only that those under whom the appellees claim never had any grant from the governor under the colonization laws, but that the governor, when the application was made to him for that purpose, peremptorily refused to make the grant; and that they never had any grant or concession of any kind from the governor of the department.

3. Because possession before the treaty, of the public lands held by the former government, without any title, is not sufficient evidence to warrant a confirmation of such a claim. Authorities to support that proposition are not neccessary, as they are very numerous in the decisions of this court published within the last ten years.