## CITY OF BROWNSVILLE v. BASSE AND HORD.

1. Plaintiffs in a suit for land asserted three distinct chains of title, calling for different quantities of land, and each inconsistent with the others. *Held*, that in consequence of the incongruity of these several titles, it was error to instruct the jury that "the titles shown by the plaintiffs "amount to a good title in the plaintiffs to the lands in the petition "described." If the court below intended to hold either one of the titles good, it should have designated which one, so that the jury could ascertain how much of the land the plaintiffs were entitled to recover under that title.

2. The lands in controversy are now the site of the city of Brownsville, on the Texas bank of the Rio Grande; and one of the titles asserted by the plaintiffs consisted of locations made on the lands in 1848, by virtue of Texas land certificates. By the Act of the Republic of Texas, of December 19th, 1836 (Paschal's Digest, Article 438), these lands were declared to be within her limits and jurisdiction, but she was never able to enforce her jurisdiction over them until the occupation of that section of the country by the forces of the United States in 1846. Prior to 1846 these lands were claimed and held by the Mexican State of Tamaulipas as part of her dominions, and in 1826 she granted them to her city of Matamoros, together with a municipal jurisdiction over them; and the city of Matamoros, by emphyteutical titles analogous to leases, granted them in parcels to sundry individuals, by whom they were held until the occupation of the country by the United States in 1846. *Held*, that the lands in controversy were not vacant public domain of Texas, nor subject to location by virtue of her land certificates.

3. By the treaty of Guadalupe Hidalgo the city of Matamoros was divested of all municipal jurisdiction over her *ejidos* (town lands) situated on the Texas side of the Rio Grande; but, *quære*, was she thereby also divested of the fee in those lands, granted to her in 1826 by the State of Tamaulipas?

4. *Quære:* Whether the sovereignty of Texas over the country on the eastern bank of the Rio Grande, never occupied by her previous to 1846, relates back to the 19th of December, 1836, when, by act of Congress, she declared the extent of her civil and political jurisdiction, and defined its western boundary to be the main stream of the Rio Grande, from its mouth to its source. (Paschal's Digest, Article 438.)

5. A mere certificate of entry, equivalent to a certificate of location, does not vest the title in the holder of the certificate. Such certificates may be evidence of an inchoate title; but the title itself remains in the sovereign. (Wilcox v. Jackson, 13 Peters, 513, cited by the court.)

6. The second title asserted by the plaintiffs was derived by them from the lessees (or emphvteutical grantees) of the city of Matamoros. *Held*, that these lessees, being mere holders from year to year, could convey no title available to the plaintiffs in this suit ; the only effect of their alienation in fee was the forfeiture of their interests to their lessor.

7. Plaintiffs asserted, as their third title, an ancient Spanish grant, which was admitted to have vested in an ancestress of the plaintiffs' vendor, who, in 1852, conveyed to the plaintiffs that part of the grant which comprised the land in controversy.   As a defense against this title, the defendant, an incorporated town, set up certain official proceedings of the governer and other authorities of Tamaulipas and Matamoros, whereby, in 1826, the title of the ancestress of the plaintiffs' vendor was divested by expropriation for public uses, and the lands conceded to the city of Matamoros as part of her *ejidos*, or town lands, and which lands were held by her and her lessees at the time of the occupation of the country by the United States in 1846.   The plaintiffs impugned the validity of the expropriation, on the ground that it was never consummated by payment of indemnification to the owners, etc.   But *held*, that a foreign government or forum must be regarded as the best judge of the validity of its own political or judicial acts, exercised upon subjects within its jurisdiction ; and therefore this court will not undertake to say that the acts of the Ayuntamiento of Matamoros, and of the Governor and the legislative authorities of the State of Tamaulipas, in 1826, expropriating for public use the lands in controversy, were not in all respects regular and valid.

8. In January, 1850, the Legislature of the State of Texas incorporated the defendant by the name and title of the " City of Brownsville ; " and in the act of incorporation it was provided that " all the right, title, and " interest of the State of Texas, in and to all the land within said tract " (*i. e.* the former *ejidos* of Matamoros) that was owned by the town of " Matamoros on the 19th day of December, 1836, shall be and is hereby " relinquished to the corporation of the City of Brownsville, and their " successors in office, in trust for the use and benefit of said city ; pro- " vided, this act shall not impair private rights."   *Held*, that this act of the Legislature was equivalent to a judicial forfeiture on office found, of any interest which may previously have subsisted in the city of Matamoros.   (U. S. *v.* Repentigny, 5 Wallace, 267, '8, cited by the court.) *Held further*, that the grant of land thus made to the defendant by this act of the Legislature was in the nature of a public grant conveying a present beneficial interest, which could not be destroyed by the repeal of the act in 1852.   And *further held*, that the title of the defendant was not impaired by the subsequent act of February 10th, 1852 (Article 4461, P. D.), whereby the State of Texas relinquished to the " original " grantees, their heirs, and legal assigns," all her right and interest in

certain grants, among which was the "Espiritu Santo," under which the plaintiffs deraigned one chain of their asserted titles.

9. On the 19th of December, 1836, Texas proclaimed herself the sovereign over all the territory bounded on the west by the Rio Grande, and after she became one of the United States her claim to that boundary was made good by arms and by the treaty of Guadalupe Hidalgo ; and the State of Texas, therefore, had a perfect right, in 1850, to forfeit by inquest of office any rights in such territory held by the State of Tamaulipas or the city of Matamoros, and to vest the same in her own grantee.   With respect to the site of the City of Brownsville being part of the former *ejidos* of Matamoros, this forfeiture was accomplished by the act of January 24th, 1850, " to incorporate " the City of Brownsville ; " and this same act granted to the City of Brownsville the lands thus forfeited, and thereby vested in that city an indefeasible title to the same.

ERROR from Calhoun.   Tried below before the Hon. Fielding Jones.

This important and interesting cause was originally instituted in the District Court of Cameron county, on April 14th, 1854 ; but subsequently the venue was changed to Nueces county, and still later from thence to Calhoun, where it was tried at the December term, 1858, and resulted in verdict and judgment in favor of the plaintiffs, Elisha Basse and Robert H. Hord.   A new trial was refused to the City of Brownsville, the defendant, and the cause is brought to this court by writ of error sued out in May, 1859.

The action was trespass to try title.   The transcript is voluminous, and consists in great part of translations of Mexican documents.   The opinion of this court contains a very lucid outline of the deraignment of the titles asserted by the plaintiffs, and a clear statement of the issues upon which the case went to trial.   It may, however, be explained that Maria Francesca Cavazos, whose last will and testament was one of the plaintiffs' muniments of title, declared in that instrument that she and her deceased husband, Don Blas Maria de la Garza, never had issue ; and she named her sister, Maria Ignacia Cavazos, and her sister's daughter, Maria Josefa Cavazos, as her heirs.   She further declared in her will that she had inherited

from her deceased husband twenty sitios of the Espiritu Santo grant, and had sold ten of them to Jose Miguel Paredes. This will was dated October 27th, 1818. Maria Josefa Cavazos, one of the two devisees, was the person designated in the opinion as Madame Cavazos; and she, together with her husband, Rafael Garcia Cavazos, by their deed of April 14th, 1852, conveyed to the plaintiffs the land now in controversy, in consideration of thirty-three thousand dollars in cash. This deed described the land conveyed in very similar language to that employed by the court below in rendering its judgment; from which, perhaps, it may be inferred that the court below rested the title of the plaintiffs upon this conveyance.

Under the instructions of the district judge, the jury returned a general verdict for the plaintiffs, but excepting such parcels of ground as the plaintiffs had donated to the City of Brownsville.

A motion for a new trial was made in behalf of the defendant, but was overruled; and the case comes up by writ of error sued out in behalf of the defendant below.

The opinion of this court refers to the case of Mussina v. Alling, 11 La. Annual Reports, 568. That was a suit brought in the Fourth District Court of New Orleans, in 1851, by Jacob Mussina against five defendants, of whom Alling alone was a citizen of Louisiana. The others were Basse and Hord, the plaintiffs in the present suit, together with Stillman and Belden, and were all citizens of Texas.

Belden, Basse, and Hord were cited in New Orleans while casually there; Stillman was not cited at all. Mussina alleged in his petition that on the 9th of December, 1848, he entered into a written contract with Stillman and Belden, by which they agreed to hold jointly certain land titles covering the town of Brownsville in Texas; that Alling was a secret partner of Belden; that Stillman, Belden, and Mussina employed the other defendants, Basse and Hord, as their attorneys in respect of the land and titles; that in December, 1849, Stillman, Belden, Basse, and Hord, aided and abetted by Alling, combined

to defraud Mussina of his rights under the contract of 1848, and to slander him and his titles to the property embraced in it. That on the 14th of December, 1849, Stillman and Belden sold out to Basse and Hord all their own interest, and also that of Mussina, for the pretended sum of fifteen thousand dollars; that owing to the fiduciary relations of these parties to Mussina, it was not competent for them thus to deal with each other to the prejudice of his rights; and that he, Mussina, is entitled to adopt the purchase of his attorneys, Basse and Hord, and by virtue of it claims to be the owner of the entire property, subject to the obligations contracted by Basse and Hord in their purchase. That the property was worth three hundred thousand dollars at the time of the transaction between the defendants, and that they had realized by sales one hundred and thirty-six thousand dollars, for which they had refused to account. Many other allegations of similar import were made in the petition. The prayer was to the effect that the defendants be compelled to convey to Mussina the property comprised in the contract of December, 1848; or, in default of such conveyance, that they be adjudged, *in solido*, to pay him three hundred thousand dollars by way of damages. The parties served excepted to the jurisdiction of the court, on the ground that the suit was of a local nature. This exception was overruled, and on trial by a jury, a verdict was rendered in favor of Mussina for a conveyance of the property within ninety days, or, in default thereof, then for two hundred and fourteen thousand dollars in lieu of the property. The judgment rendered in accordance with this verdict, was appealed by the defendants to the Supreme Court of Louisiana; and that court, at its June term, 1856, held that in so far as the suit sought to compel a conveyance it was a real action, and not within the jurisdiction of the Louisiana courts. And in so far as the suit was for damages, the court considered the merits of the titles asserted by the parties to the lands in controversy, showing their doubtful character, and that they were still in contestation in the courts of Texas and of the United States; and showing more particular-

30

ly, that so far as those titles rested upon the emphyteutical grants by the City of Matamoros, and upon the locations made under Texas land certificates, they were not maintainable. The Supreme Court of Louisiana therefore reversed the judgment in favor of Mussina, and directed a nonsuit in his case.

The reporter regrets the impracticability of inserting at least the greater portions of the arguments filed by the counsel for both sides. in this cause. They elucidate interesting questions of Mexican law, and to those not familiar with Mexican modes of procedure, they would convey much curious information. The ability which characterizes them elicits, as will be seen, the high commendation of the court. But they are necessarily elaborate, and space here can only be afforded for such portions of them as have a direct and material bearing upon the principal questions involved and decided.

*Davis & Alexander*, and *Powers & Maxan*, for the plaintiff in error. Upon the termination of the victorious war against Mexico, in 1848, which definitely settled the southwestern boundary of the State of Texas, a large body of American citizens established themselves upon the left bank of the Rio Grande, opposite the present City of Matamoros, which is located on the right bank, in Mexico, and then founded the town of Brownsville, Texas. The site upon which Brownsville was erected formed part of the town tract or *ejidos* of Matamoros, which, by the eventuality of the war, had been severed, and, thereafter and thereby, passed under the actual jurisdiction of the State of Texas.

These lands of Brownsville had been, for more than a quarter of a century, used and enjoyed by the citizens of Matamoros; and the corporation of that city had exercised authority and dominion over the same, without contest or molestation, during all that time, and, by virtue of its right, had issued emphyteutical titles to such of the inhabitants as desired to cultivate and improve portions of the land. The nature of this class of titles implies the direct and absolute ownership in the

grantor, and simply a right of usufruct in the grantee, upon the payment of a yearly rent and subject to forfeiture upon contingencies. That is to say : That the city of Matamoros, in this case, claimed to be the true owner of the land, reserving to itself the absolute fee, and farmed out to its inhabitants the right to continue to use the land so long as the conditions of the precarious title granted were complied with. The land in question in this suit, then, belonged to the City of Matamoros, and under the class of titles mentioned, had been and was nearly all occupied, cultivated, and improved, at the time the said corporation lost its authority over it by the severance from Mexico.

Upon the heels of the American army the land speculators flocked, and the greater portion of the present site of Brownsville was located upon and surveyed under Texas land scrip.

And these locations and surveys are one of the titles presented by the plaintiffs in the court below.

In addition thereto, the very same emphyteutical titles which showed the true ownership of these lands to be vested in the corporation of the City of Matamoros, covering the greater portion of the said *ejidos* in Texas, were purchased by Charles Stillman, Samuel A. Belden, and Jacob Mussina, and, afterwards, conveyed to the plaintiffs below by two, only, of the three before-named purchasers, Jacob Mussina never having joined in any conveyance of his interest therein.

And this is another title presented by the plaintiffs in the court below.

Subsequently, a claim to the land in question arose under an old Spanish grant to Don José Salvador de la Garza, embracing nearly sixty leagues of land on the left bank of the Rio Grande, called the " Espiritu Santo," and including the town site of Brownsville. From the heirs of said José Salvador de la Garza, the lands in question had been expropriated and vested in the corporation of Matamoros, for municipal purposes, by the Congress of Tamaulipas, in 1826. This claim of title

under the Spanish grant set up by Doña Maria Josefa Cavazos, was, by her, conveyed to the plaintiffs.

And this is the third title presented and relied upon by them in the court below.

In the year A.D. 1850, the citizens residing on the tract formerly a part of the *ejidos* of Matamoros, were declared a corporate body by the Legislature of the State of Texas, under the name of the " City of Brownsville," and were granted the land within said tract, in trust, for the use and benefit of said city. (This act of the Legislature will be found in the opinion of the court.—Reporter.)

It is not contended that the land did not belong to the State of Texas at the time that the same was located upon, but it is insisted on, by the defendant, that before it could be located upon, it was necessary that the political authority of the State should have determined what was to become of the rights in said lands, originally lawfully granted by the State of Tamaulipas, in 1826, to the corporation of Matamoros. (Lewis *v.* City of San Antonio, 7 Texas Rep., 288; the State *v.* Delesdernier, 7 Texas Rep., 76; Blair *v.* Odin, 3 Texas Rep., 288.)

To show that such was the intention of the political authority of the State in this case we have only to refer to the act of the Legislature dated January 24th, 1850, wherein, for the first time, the public disposition of the lands of the *ejidos* is made, continuing in favor of the inhabitants thereon, the trust for which they had been originally granted by its predecessor, the State of Tamaulipas. In the said act, incorporating the City of Brownsville, we find the expression of the sovereign will, and it will reasonably be presumed that in granting to the defendant its right to these lands, the State excluded the idea that they could have been rightfully located upon previously.

The defendant submits that although the fee was in the State of Texas, the tenure of the enjoyment and occupancy derived from the former government remained unaltered until declared forfeited by some positive act of the political power of the State. The rights of the labor holders were subject to the con-

trol and disposition of the government, which alone could terminate their tenure, but until it did so, it is submitted that said tenure was to continue until otherwise ordered by the State.

Our law offers no land for location but the vacant, and land covered by an inceptive grant is not vacant until such grant is disposed of by some act of the government. When policy requires it, the government will take some steps to dispose of the grants, and to inquire into the fulfillment of conditions, but it never was the intention to vex the community by subjecting them to forfeiture at the pleasure of every private locator. "The primary control over the public domain belongs to the "legislative branch of the government, and the obligation to "respect and complete the incipient title emanating from a "former sovereignty, rests exclusively in the political authority. "By this, they may be altogether disavowed, or they may be "restricted, or they may be recognized, with or without condi-"tions or restrictions." (Paschal v. Perez, 7 Texas, 266.) .

There was no action on these rights declared until January, 1850, when the State of Texas granted the lands to the defendant. The forfeiture did not take place *ipso facto* by the declaration of boundaries in 1836. This court has heretofore held, in Hancock v. McKinney, that before a location could be made upon lands claimed to be liable to forfeiture, there must have been an actual forfeiture, and that no individual who is the holder of a land certificate is thereby invested with such a high attribute of political power. And this decision is based upon Section 4, Article 13, of the Constitution of 1845, which declares that "all fines, penalties, forfeitures, and escheats which "have accrued to the Republic of Texas under the Constitution "and laws, shall accrue to the State of Texas, and the Legisla-"ture shall by law provide a method for determining what "lands may have been forfeited or escheated;" and the court add, that no method having been provided by law, at that date (1852), to determine what lands have been forfeited or escheated, the courts must wait the lead of the political authority, before they can act. In Swift v. Herrera, 9 Texas, 289, it was held

that individuals cannot, since the adoption of the State Constitution of 1845, by location assert any right to lands previously granted, on the ground, simply, of forfeiture. It will be noticed that the locations and surveys presented by the plaintiffs were made in the year 1848, and subsequent to the adoption of the Constitution. (See also United States v. Grundy, 1 Pet. Cond. R., 554; Clark v. Smith, 13 Pet. R., 195; 6 Cr. R., 78; 9 Id., 11.)

Therefore, the emphyteutical title of the labor holders, which they had derived from the former government, bestowing upon them the right of occupancy and enjoyment, subject to the superior control and disposition thereof, by that government, descended, unaffected by the change of sovereignty, and remained unaltered down to the time when the State of Texas determined those usufructuary titles, in the year 1850, by the act incorporating the City of Brownsville. Upon these grounds the defendant concludes that the lands in question were not open to location at the time when the surveys presented by plaintiffs were made.

But, should it be considered that these lands did escheat at once and *ipso facto* by the extension of the boundaries of the State, in 1836, even then, the defendant contends that they were reserved from location. The 7th Section of an act of the Republic of Texas, approved June 9th, 1837, authorizing the issuing of promissory notes by the government, enacts, "that all "improved forfeited lands are hereby pledged for the redemp- "tion of these promissory notes of the government, and in ad- "dition, the faith and credit of the government are solemnly "pledged." In 1851, this court was not aware that this act had been repealed, or that the pledge so given had ever been withdrawn. (Paschal v. Perez, 7 Texas, 346.)

Now, the proof is full and complete, that the land in controversy was improved, and if, in 1836, it had become forfeited or escheated to the State of Texas, it came within the scope of that enactment, and was exempt from location. To place the land within the domain of commerce, would have required the

express repeal of that law, and until that was done the plaintiffs could not locate their certificates upon said land.

The invalidity of the title of plaintiffs based upon the locations and surveys is further evidenced by the fact that no patents have been issued by the State upon them. This fact makes them an inchoate and imperfect title, which, whatever strength they might have as against third parties, could not be available against the State of Texas, or the City of Brownsville, which claims by absolute grant from the State.

Now, as regards absolute grants by act of the Legislature, it is clear that no other step is necessary to complete the title; but with regard to certificates of location, before the State can be completely bound and precluded, there must be letters patent issued on these certificates in order to make perfect title.

What are the consequences of such want of a patent in this case? We shall see by the decision of the Supreme Court of the United States (Wilcox v. Jackson, 13 Peters, 515): " The " question is whether a person holding a register's certificate " —(in this case, a recommended and returned certificate of location and survey)—" without a patent, can recover the land as " against the United States,"—in this case, as against the State of Texas, through its grant to the City of Brownsville.

" We think it unnecessary to go into a detailed examination " of the various acts of Congress, for the purpose of showing " what we consider to be true in regard to the public lands, that " with the exception of a few cases, nothing but a patent passes " a perfect and consummate title. One class of cases, to be ex- " cepted, is where an act of Congress grants land, as it some- " times does, in words of present grant. But we need not go " into these exceptions. The general rule is as we have stated, " and it applies as well to preemptions as to other purchases of " public lands; thus it will appear by the very act of 1836, " which we have been examining, that patents are to issue in " preemption cases. This then being the case, and this suit " having been in effect against the United States, to hold that " the party could recover as against them would be to hold that

" a party having an inchoate and imperfect title could recover
" as against the one in whom resided the perfect title. This, as
" a general proposition of law, unquestionably, cannot be en-
" tertained." (*Wilcox v. Jackson*, 13 Peters, 515.)

And so the act of January 19th, 1840, of the State of Texas,
that patents are to issue upon the certificates returned as genu-
ine, thus showing, by the same reasoning, that the perfect title
is completed, only, when such patent issues.

Whatever may be the rights vested in the locator, by virtue
of a genuine certificate—as towards the State they are not such
as will preclude the Legislature from exercising its sovereign au-
thority ; and until a patent has issued thereon the State has not
parted with its title, and it has the undisputed power to refuse
to complete the title; and may grant away the land located on,
or reserve it for public uses, or withdraw it entirely from the
domain of commerce.

But the State, in the present case, through its proper officers,
has refused to make the complete title by issuing the patent,
and through its Legislature it made a complete grant of the
lands located upon to the City of Brownsville. Not once, only,
but twice. First, on the 24th of January, 1850, and afterwards
on February 7th, 1853. For these reasons it is submitted, that
the plaintiffs' title under the locations and surveys never was
other than an inchoate and imperfect title, subsequently de-
stroyed by the act of the State of Texas.

We will next consider the merits of plaintiffs' titles under
their labors, which they themselves allege came to them from
the Ayuntamiento of Matamoros.

The defendant claims, that if the plaintiffs rely upon these
titles, as showing any right whatever, this right can only be
usufructuary and not in fee ; that is to say, that the ownership
remained in the corporation of Matamoros, while the enjoyment
and occupancy was in the grantees. And in that case the de-
fendant's title would be sustained.

These labors, being portions of the *ejidos*, or town commons,
were only held from the corporation as tenancies, and the tenure

of them was limited to such time as the holders continued to cultivate and preserve them under fence, paying a stipulated rent to the Ayuntamiento therefor.

And they were further limited by the necessities of the corporation, in taking them for streets, town lots, and other public uses.

To show that such was the nature of said tenure, reference is made to an ordinance of the corporation of the City of Matamoros, which is as follows: " Article 48. Those who hold labors " within the *ejidos*, shall pay by the year, hereafter, at the rate " of twelve bits for each twenty thousand varas which they cul- " tivate, whatever may be the crops, in the nature of an acknowl- " edgment, by reason of the benefit of taking the fruits." That is, the usufruct.

It may be here observed that the character of the labor assigned to Doña Francisca Cavazos, one of the heirs under the Espiritu Santo, through whom plaintiffs claim, was also usufructuary. The government, in passing upon her request to be allowed to retain her labor, decide " that when the dis- " tribution of the town tract (*ejidos*) of that town is made, " the said Cavazos would be borne in mind, so as to assign her " the use of the land that as a citizen is due her."

Further, the *ejidos* are declared by the laws of Spain and Mexico to be inalienable property, with special prohibition to the sale of the same by the Ayuntamientos. (Part 5, Title 5, Law 15. Law 1, Book 7, Title 16 ; Nov. Rec. New Orleans *v.* United States, 10 Pet.)

This, of itself, is sufficient to prove that the plaintiffs can maintain no title to the lands under their labors; and, on the contrary, places the right in the City of Matamoros, to which this defendant has succeeded.

On the other hand, the plaintiffs could not have prescription under such titles either against the corporation of Matamoros or the government of Mexico, because they are mere tenancies, acknowledging the ownership in another, which precludes prescription, and, further still, because, by the laws of Spain and

Mexico there must be a capacity in the thing itself to be pre-scribed, and *ejidos* are specially mentioned as being imprescrip-tible. (Part 3, Title 29, Law 7.)

Finally, the plaintiffs claim to have purchased the labors from those who held them immediately or mediately from the Ayuntamiento of Matamoros, but they have totally failed to introduce the titles to such holders, from said Ayuntamiento, or any of their intermediate links.

How, then, could the judge have legally instructed the jury that this class of titles showed the right to the land, as described in plaintiffs' petition, to be in them ?

Such charge was, therefore, manifestly erroneous as regards this claim of title set up by the plaintiffs.

## THE ESPIRITU SANTO TITLE.

The plaintiffs produced a testimonio of an old Spanish grant for about sixty leagues of land, including the town site of Brownsville, issued in 1781, to Don José Salvador de la Garza, by the Viceroy, and, by agreement of counsel, the right under said grant to the portion embracing the town site of Browns-ville was acknowledged to be vested in Maria Francisca Cava-zos, subject, however, to the adverse claim of defendant, and without prejudice to its right.

By parol evidence, the plaintiffs prove the succession of Doña Maria Francisca's estate down to Doña Maria Josefa Cavazos, the grantor of the plaintiffs.

The defendant contends that the right of Maria Francisca Cavazos to the land including Brownsville was lawfully taken from her by the authorities of Mexico during her lifetime ; that when she died, that portion of her previous estate did not pass to her heirs ; that the partition between them did not include this land, which had been expropriated from the private domain of her ancestor to the public uses of a town about ten years before said partition ; that the land so expropriated, after the declaration of the boundaries of Texas, became subject to the con-

trol of this State, and remained unforfeited and reserved from location until the same was granted to the City of Brownsville, under the act of incorporation approved January 24th, 1850, and the act of February 17th, 1853.

This question of expropriation arose under the principles of the civil law, and previous to the introduction in Texas of the common law of England.

The attention of the court is respectfully directed to Article 5297, Paschal's Digest, which provides that the law of which this article is the 6th Section, shall not be so construed as to alter, impair, or take away the rights of parties as arising under the laws in force before the introduction of the common law, but the same shall be decided by the principles of the law or laws under which the same accrued, or by which the same were regulated, or in any manner affected.

In the application of this principle, the act of expropriation, having been effected by what is now to us a foreign government, must be regulated by the civil law of Mexico.

Halleck, in his work on International Law, page 117, says as follows : " So far as the jurisdiction of a foreign court depends " upon municipal law, or its proceedings are governed by " municipal rules, it is the exclusive judge of its own jurisdic- " tion and of the regularity of its own proceedings, and its " decision on these points binds the world."

" Of its own jurisdiction," says Chief Justice Marshall, " so " far as depends on municipal rules, the court of a foreign " nation must judge, and its decision must be respected."

If the proceedings are " merely irregular, the courts of the " country pronouncing the sentence are the exclusive judges of " that irregularity, and their decision binds the world." * * * " And if the matter in controversy is land, or other immovable " property, the judgment pronounced in the *forum rei sitæ*, is " held of universal obligation, as to all matters of right and " title which it professes to decide in relation thereto. And " this results from the very nature of the case, for no other " court can have a competent jurisdiction to inquire into or set-

"tle such right or title.   By the general consent of nations,
" therefore, the judgment  of the *forum  rei sitæ* is held abso-
" lutely conclusive."

In speaking of the rights of civil and criminal legislation,
Mr. Wheaton, page 161, says:  " The first general principle on
" this subject  results immediately from  the fact  of the inde-
" pendence  of nations.   Every nation possesses and exercises
" exclusive sovereignty and jurisdiction throughout the full ex-
" tent  of its territory.   It follows, from this principle, that the
" laws of every State control, of right, all the real and personal
" property within its territory, as well as the inhabitants of the
" territory, whether born there or not, and that they affect and
" regulate all the acts done, or contracts entered into within its
" limits."    Consequently,  "every  State possesses the power of
" regulating the conditions on which the real or personal prop-
" erty within its territory may be  held or  transmitted; and of
" determining  the state and capacity of all persons therein, as
" well as the validity of the contracts and other acts which arise
" there, and the rights and obligations which result from them ;
" and, finally, of prescribing the conditions on which suits at law
" may be commenced and carried on within its territory."

And to the same effect, the same author, on page 165, says:
" Hence it follows, that the law of a place where real property
" is situated, governs exclusively as to the tenure, the title, and
" the descent of such property."

To the same effect, also, has this court decided, in the case of
Powell *v.* De Blane, 23 Texas, 76, that " no doctrine can be
" more obviously just and rational, than that the courts of every
" government have the exclusive authority of construing its
" local statutes, and their construction will be respected in every
" other country."

The doctrine as to the effect of acts of a former government,
seems to be concurrent with that as to a foreign government ;
in which double attitude stands this case.   In the case of Han-
cock *v.* McKinney, 7 Texas R., pp. 442,'3, the court says: " The
" presumption of law, that the public act of the public officer,

" purporting to be exercised in an official capacity, and by pub-
" lic authority, shall be presumed to be the exercise of a legiti-
" mate and not an usurped authority, is recognized in its full
" force." 1 Texas R., 699.   And again, treating of the acts done
by the Ayuntamiento, it is said, " All the transactions, the grant,
" the revocation, and the re-grant, occurred under former
" governments of the country; and while usurpation of power
" would be disregarded, and flagrant violations of law redressed,
" yet we will not, with a hypercritical spirit, revise matters
" determined by former authorities, or disturb rights founded
" upon their action or adjudication."   Ibid, 709.

" This doctrine is so manifestly correct and just, as to com-
" mend itself to our unqualified assent.   A different doctrine
" would unsettle every right which we esteem secured to us by
" the sure guarantees of the Constitution and laws.   It would
" overturn the whole doctrine of *res adjudicata*, and destroy
" alike certainty, stability, and permanency, as well in respect
" to acts done and rights adjudicated by ourselves, as by those
" who have preceded us."

On January the 30th, 1826, the government of the State of
Tamaulipas erected the congregation of Refugio into the town
of Matamoros, and ordered that the Executive should determine
whatever was necessary to clear up the property to the land on
which said town was, causing indemnification to be made should
it be private property.

The Ayuntamiento of Matamoros met on the 26th day of
February, 1826, to treat about the survey of the town tract, in
conformity with the grant of the Legislature, and it was ordered
that Don Cayetano Medrano be the surveyor, and that Don
José Maria Tovar accompany him as an associate; that all the
parties interested on the upper portion, open paths in a straight
line for one league, and those on the lower portion do the same,
and all jointly open paths to the south and north, accompanied
in all these operations by Don Cayetano; that all this being
concluded, the line or chain be extended through the same
until the cross is made perfect.   It was further ordered, that

the parties owning the lands be called; that the order of the government be communicated to them, notifying them that the survey of the town tract was about to commence, and that they appoint a skillful person to witness the survey.

It appears that, at that time, the only parties interested in said land were three, Maria Guadalupe Longoria, Rita Giron, and Francisca Cavazos. Maria Guadalupe Longoria appointed as her expert Don Juan Longoria Serna; Rita Giron sent word twice that she agreed to whatever should be done by the judge and the surveyor; Francisca Cavazos, being present, made no objection, but said that she would not appoint an expert, as she had no examined surveyor to attend for her; the Ayuntamiento designated Don Manuel de Alcala to represent the people of the town.

The Ayuntamiento then ordered, that as soon as the paths were concluded the survey would be proceeded with, and that the squaring of the area should be effected as soon as the perfect cross, which had been ordered to be made, should be completed.

We do not propose to enter into a full statement of the complaints made by Francisca Cavazos against two trespassers on her labor, which encumber the records, embarrassing and confusing the governmental acts in respect to this expropriation. Suffice it to say, that these were matters of private grievance, showing no opposition on her part to the carrying out of the grant of *ejidos*, and should be carefully eliminated from this principal and important question.

The first appearance of Francisca Cavazos, in writing, is her application to the Ayuntamiento of Matamoros, March 28th, 1826, wherein she states that she knows of the superior order for the *ejidos* of the town, and that it included her property, and uses this language: "I now say that I am satisfied for the " superior order to be complied with." She proceeds to ask to have her labor and ranchito set apart for her use, to be left in possession of the same, and when indemnity shall be made for the *ejidos* that the value of the said labor and ranchito be deducted from the amount to be paid her.

And she adds, " that if this cannot be obtained, because " it be not just, I will replace this small piece of land out " of other lands left me." This petition is dated March 28th, 1826.

Here we have two leading facts : the order for the survey, and the conformity of the parties. It would strike any one that nothing could impede the friendly completion of the expropriation, to all appearances; but we shall see hereafter that the stubbornness and contumacy of this same Francisca Cavazos placed the government in such a position that the final proceedings had to be carried on in her default.

It appears that the Ayuntamiento of Matamoros made no order upon her petition, because it included a matter of private complaint on her part against two trespassers on her land; and this being in the nature of an action in trespass she should have previously cited them in conciliation, which according to the laws of the country was the indispensable pre-requisite to the bringing of such actions. This is seen from the certificate of the second lieutenant, Juan José Cavazos, under date of April 10th, 1826, which accompanied her petition to the Governor of the State, at Victoria, dated May 2d, 1826.

She appealed to the superior tribunal of justice, under date of April 11th, 1826, stating that no notice had been taken of her petition by the Ayuntamiento of Matamoros, and it seems that this court did not take jurisdiction of the case, probably on account of the informality of her proceedings, but passed it over to the Governor of the State, as having some relation to public matters, in that part of it which referred to the indemnity to be paid her for her lands by the State. We next find that the Governor took action on her petition, and ordered the Alcalde to report about the deduction of the labor and ranchito from the value of the expropriated land and other propositions made by her, so that in view of the public utility to be derived from either of her offers, the government might make the proper order. And by way of spurring the authorities of the town to the discharge of their duties, required them to treat

her with that equity and respect which every citizen deserves. This was dated April 18th, 1826.

The Ayuntamiento of Matamoros in fulfillment of the order of the Governor proceeded to make the report required. A committee was named, composed of a councilman, to represent the city, a citizen, to represent the parties complained of by her, and one appointed by Francisca Cavazos, with instructions to estimate the amount of land which composed her labor and ranchito.

They were ordered also to examine into the causes of private complaint made by her, but these not being relevant to the issue in this case, need not be stated.

The substance of the report was, that Francisca Cavazos had, under fence, land enough to plant nineteen pecks of corn, and should not be allowed to retain that amount of land in the *ejidos*, because, upon being indemnified for her property, she would only be entitled to enough to plant three or four pecks of corn, like all the rest of the citizens; and that to leave her with more land, as she pretended, would be injurious to the public interests. This report was dated May 8th, 1826.

Under date of May 2d, 1826, Francisca Cavazos, interpreting the final part of the Governor's decree of April 18th, 1826, into an order that the two persons she charged with being trespassers should be ejected, addressed another communication to the Governor complaining that this had not taken place. Nowhere does it appear that she opposes the appropriation of her lands for public use, but she continually vexes the authorities with her private wrangles.

In this communication to the Governor, she again expresses her satisfaction, and acquiescence in such expropriation, and persists in praying that she be allowed to retain her labor and ranchito in the *ejidos* for purposes of her maintenance; still offering to deduct their value from the indemnity, or to replace the same amount of land elsewhere.

Harassed and worn by her importunities, the government,

under date May 11th, 1826, acceded to her offer to retain her labor, and ordered that when the lands should be distributed, she should have the use of such a portion as a citizen as would be just, considering the public utility, derived from the *ejidos* being taken from her lands.

This showed on the part of the government a spirit of conciliation and a desire to do her justice; not as waiving its rights, but as extending to her in advance a portion of the compensation which it is fairly to be presumed she finally received.

We see from the record that the survey of the *ejidos* did actually take place, in accordance with the act of the Ayuntamiento of Matamoros of February 26th, 1826. For, in the communication of the Governor to the Ayuntamiento of Matamoros, he says: "the expediente of the survey of *ejidos* of that "town, and which accompanies the official communication of "the 11th of December of last year, has been sent to the Secre- "tary of the Council of government of this State, and upon his "report I will decree upon the subject. I notify you of this in "answer to your said communication. City of Victoria, Jan- "uary 11th, 1827."

The communication of the Ayuntamiento to its attorney, withdrawing his authority, specially mentions that the *espediente instruido* (complete record book) of the survey was in the hands of the Governor, having been taken to him by the attorney himself. This letter is dated April 21st, 1827.

There cannot be a shadow of doubt that such survey was had embracing one league square, as mentioned in forming the perfect cross for the *ejidos*. Francisca Cavazos did not oppose the survey; indeed she could not, but was bound by the acts of the Legislature and the general laws of the country.

Besides, there was no necessity for an actual survey in order to ascertain the boundaries of the *ejidos*. The severance of the *ejidos* could take place otherwise. The public laws of the country established the initial point of the surveys to be the centre of the main plaza of the settlement. (Rec. Ind., Vol. II. Lib. 4, Tit. 7, Law 1.) Therefore there can be no ambiguity

31

as to what was taken.   This principle seems to be fully sanctioned by the case of George *v.* Thomas, 16 Texas, 74.   On the other hand, the *ejidos* of towns in America were settled by the Royal government of Spain and declared to be one league, measured in the four cardinal directions, commencing from a central point, which was the main square of the town.   See the 61st Article of the Ordenanza de Intendentes, and the Royal Cedula of October 15th, 1713, compiled in the Autos of Montemayor y Beleña, last folio, No. 383.   In this court (Town of Refugio *v.* Byrne, 25 Texas, 193) it was held, that it was not necessary, in the first place, that a formal grant to the town should be made, nor that an actual survey should take place, nor that any other act should be performed to ascertain the boundaries of a town under the Spanish and Mexican system than is prescribed by the law, which provides that "four square "leagues," shall be designated for each.   It was not essential to the validity of the title that the boundaries should be capable of being ascertained exactly, upon the principle that what can be made certain is considered as certain.   *Quod certum fieri potest, certum est.*

But to return.   After the unbecoming and contemptuous conduct of Francisca Cavazos towards the Ayuntamiento of Matamoros, when notified of the decree of the 11th of May, 1826, we hear no more of her.   She was furious at the determination taken by the government, to assign to her the use of her labor and ranchito until the distribution of the *ejidos* should take place, instead of allowing her to keep them absolutely; and she resolved, thenceforth, not to appoint the appraisers to estimate the value of the land taken from her for public use, as required by the Constitution.

This was a novel case; no special law on the expropriation of lands existed: no special method of procedure was pointed out. Here was a government endeavoring to carry out its policy for the welfare and aggrandizement of the State, by fostering a prosperous and growing city.   To do so, it required the appropriating of land to public use belonging to private parties, as it

had a right to do under the Constitution. But that Constitution also required that indemnity should be made for such appropriation. The party owning a part of this land refused to assist in arriving at the value of the lands by appraisement. What should be done in such a case? Could a poor, deluded woman subject the measures of the government to her whims and caprices, and thus thwart its purposes, and defeat the public good? Is the establishment of new towns, forts, arsenals, and the like, to depend upon the willful and malicious opposition of an individual? Could Francisca Cavazos block the wheels of the government because she entertained a spiteful resentment against the Alcalde of Matamoros for not siding with her in a petty quarrel between her and two neighbors? This was the motive that prompted her to refuse to appoint an appraiser.

Yet if Francisca Cavazos was entitled to compensation under the Constitution, that Constitution also required of her as a duty to appoint an arbitrator appraiser. This is the language of the Constitution of the State of Tamaulipas of 1825: "Article 13. "Neither Congress nor any other authority can take property, "even of the least value, belonging to private persons. When- "ever for the purposes of a known public utility it becomes "necessary to take the property of any one, he shall be first in- "demnified according to the judgment of arbitrators, appointed "by the Governor of the State and the interested party." It is clear that in view of her contumacy, the State had but one course to pursue: and that was, to give her due notice and make her a proper tender, and in case of her persistent refusal, to proceed without her. This is all that the State could do in carrying out the provision of the Constitution which required previous compensation for her land, and without her concurrence it could do no more, and therefore such acts amounted to actual performance of such requirement. "If the act covenanted or "agreed to be done by one party cannot be completed without "the concurrence of the party for whom it is to be done, the "former must do all he can do, without such concurrence, to "complete the act, and if the party who is to act offers and does

" as much as he can without such concurrence he does what is " equivalent in law to actual performance." (Addison on Contracts, 1132.)

We will now see what the government did in such an unusual situation. On the 15th of October, 1827, the following decree of the Congress of the State of Tamaulipas was passed on the subject, to supply the want of a law regulating expropriations, and to remedy the consequences of Francisca Cavazos' contumacy :

" The Secretary Delegate of the Honorable Congress of this " State, under date of the 15th inst., communicates to me the fol- " lowing :

" Your Excellency :—In its session of to-day, the Hon. Con- " gress has enacted as follows :

" The executive government, as of its powers, shall order " that the civil authority of Matamoros cause Da. Rita Giron " and Da. Francisca Cavazos to comply with the provisions of " the Constitution and the laws. If, being notified for the second " and third times, those ladies are unwilling to appoint the cor- " responding arbitrator for the indemnity of the lands to be taken " as *ejidos*, the Ayuntamiento shall proceed to the survey and " the use of them, without further citation. Whenever it shall " happen that the parties or their heirs claim the indemnity for " their lands, and are willing to appoint the arbitrator provided " for in the 13th Article of the Constitution of the State, a new " survey will be made if they so desire it, and there shall be as- " signed them in compensation the land which they have pre- " viously asked for.

" This provision shall be communicated to the executive gov- " ernment, in order that he follow it in the present case, and " that it serve as a general rule in the other cases which may " arise, until a decree shall provide a basis for future observance.

" All of which, by order of the Hon. Congress, we forward " to your Excellency, for your information and corresponding " purposes, returning to you at the same time the documents.

" And I communicate the same to your Honor for your infor-

" mation.   God and Liberty, Victoria, October 15th, 1827,
" Fourth Year of the Installation of the Congress of this State.

" Lucas Fernandez,<br>
" Eleno Vargas."

Whose fault is it then, if it be true, that Francisca Cavazos
was not compensated ?   Will she or her heirs be allowed to take
advantage of her own wrong, and defeat and frustrate the rights
of third parties, by arguing their wrong in not paying her, when
she was not paid owing to her own wrong ?   Certainly not.
And she is concluded by her own default.   These proceedings
were instituted and conducted by the highest authorities of the
State of Tamaulipas in conjunction with the Ayuntamiento of
Matamoros and herself.

The action of the Ayuntamiento under the decree aforesaid
was not only legitimate but their only rule of conduct.   The
fact that Francisca Cavazos contumaciously refused to join in
the appointment of arbitrators after she was cited to do so, and
as she was required by the Constitution, authorized the govern-
ment of Tamaulipas to proceed to the occupation and survey
of the land without her further intervention.

And the defendant, in this connection, submits that the said
Cavazos having been duly cited to perform her part of the pro-
ceeding pointed out by the Constitution, and having refused to
appoint an arbitrator to estimate the value of her land, the gov-
ernment and the corporation were at liberty and obliged to
proceed in completing the expropriation of the same.   They
did accordingly proceed without her further action.   The cor-
poration, acting in this capacity, was the chosen tribunal of the
State in carrying out the public policy of the country, having
for its object, among other purposes, the establishment of towns.
As such tribunal it had jurisdiction of the subject-matter, and
a jurisdiction, in fact, *in rem;* and it was the duty of all citi-
zens of the country, and more especially parties whose interests
were to be affected, to yield implicit obedience.   It is a doc-
trine of the civil law, and especially of the Spanish system of

jurisprudence, for the tribunals and all legal authorities, within the scope of their respective functions, to enforce obedience to their orders and regulations, so that if a person is duly cited to do a thing which the law enjoins upon him, and such person refuses so to do, the law adjudges him to be in contumacy (*rebelde*), and the court or other authority proceeds without him, with the same effect as though he were present and consenting. (Escriche: Verbo, *Rebeldia*.)

"He is truly contumacious in a cause who abandons it, either "because he failed to appear from the beginning when he was "cited, up to the rendition of the judgment, or because, if at "some time he did appear, he afterwards deserted it. Being "thus embraced in the class of contumacious parties, he cannot "appeal nor re-appeal from such judgments to which he himself "consented by his inaction and contumacy; so that it may be "said of him that he renounced the aid of the laws, which only "aid the vigilant and never those who sleep, and this is estab-"lished to avoid the grave danger that all persons called to an-"swer at law might easily contemn the first proceedings, and "force the causes to extraordinary remedies, whereby those "which are provided in the gradual order of the contest would "become illusory."

This doctrine by analogy and practice prevails in all matters, both judicial and governmental, in Spanish countries.

Under the old Spanish law of the Partidas, upon which this practice is based, the party was required to be cited three times before he could be declared contumacious and further proceedings had, but under the Royal Decree of March 10th, 1774, and the Auto Acordado of June 6th, 1806, it was ordered that in America one citation only should be sufficient to put the party in default. (Rebeldia, Lib. 11, Tit. 15, Law 2, Nov. Rec.)

These proceedings are analogous to our system of defaults, which is founded upon the gravest principles of public policy and convenience, so that it may be said of Doña Francisca Cavazos that by her inaction and contumacy she renounced the aid of the laws, that she herself contributed to the consequences

of which her descendants now complain, and that thereby they are without the pale of that consideration at the hands of this court which she peremptorily and contemptuously refused from her own government at the time it was offered her.

The defendant having shown the completeness of its title under the expropriation, and demonstrated clearly that the *ejidos* were granted by the State; that Doña Francisca Cavazos agreed to such taking; that the *ejidos* were duly surveyed and taken possession of, now submits to the court, for its consideration, the leading principles of the Spanish law regulating the payment in cases of expropriation. Under the civil law governments have the inherent power, by virtue of the right of eminent domain, to appropriate for public use the property of any private individual without the actual technical previous payment of the indemnity, so that the indemnity be provided for, notwithstanding that the law requires such previous payment. For instance, the Law 2, Tit. 1, Partida 2, provides particularly that previous payment shall be made in expropriation, and yet the great commentator, Gregorio Lopez, lays it down distinctly in his 23d Note to said law, that the payment need not precede the taking of the property appropriated, and he gives a variety of cases.

And again, notwithstanding such requirement, the Law 53, Tit. 5, Partida 5, declares as follows: " If the king sell or grant " a thing belonging to another, the dominion (ownership) of " that thing passes to the vendee or grantee. But he from " whom he has taken it can ask the king to give him the value " of that thing during four years, and the king ought to pay for " it; and if during four years he (the owner) do not ask for the " value, he cannot do so thereafter."

Of course the term king, as used in this law, is synonymous with the power exercised by the sovereign political authority of the State under the republican system of Tamaulipas.

The principle governing expropriations in other countries where the civil law prevails, is a sure guide in determining the effect of the want of previous payment. And so, examining the

doctrine held in France on the subject, we find that it would not be sufficient to invalidate an expropriation. In that country, where the Constitution and laws provide also for the same previous payment, it has been decided in practical cases as follows:

"151. If a proprietor has been dispossessed (by expropriation) "by an abuse of power, he can claim an indemnity, to be ad-"judged by the courts the same as if the legal forms had been "followed." (Dalloz, Jurisprudence Generale; Verbo, Propriete, Section 1, Article 3, page 449.)

Again:

"39. Inasmuch as actions in re-vindication cannot prevent "the expropriation nor arrest its effects, it follows that when "the expropriation has been made, the rights of the proprietor, "whoever he may be, are transformed to a claim for the price, "and the real estate remains free of pursuit." (Dalloz, for the year 1845; Verbo, Expropriation, column 263.)

We will also examine what is the doctrine and practice in our own country, with respect to the necessity of an actual previous payment in cases of expropriation. We find the question admirably defined in an American work of high authority, as follows:

"When the property is taken directly by the State, or by any "municipal corporation by State authority, it has been repeat-"edly held not to be essential to the validity of a law for the ex-"ercise of the right of eminent domain, that it should provide "for making compensation before the actual appropriation. It "is sufficient, if provision is made by the law, by which the "party can obtain compensation, and that an impartial tribunal "is provided for assessing it."

The same authority continues: "The decisions upon this "point assume that when the State has provided a remedy, by "resort to which the party can have his compensation assessed, "adequate means are afforded for its satisfaction; since the "property of the municipality or of the State is a fund to "which he can resort without risk of loss. It is essential, how-

"ever, that the remedy be one to which the party can resort on "his own motion; if the provision be such that only the public "authorities appropriating the land are authorized to take pro- "ceedings for the assessment, it must be held to be void.

"But, if the remedy is adequate, and the party is allowed to "pursue it, it is not unconstitutional to limit the period in which "he shall resort to it, and to provide that, unless he shall take "proceedings for the assessment of damages within a specified "time, all right thereto shall be barred.    The right to compen- "sation, when property is appropriated by the public, may al- "ways be waived, and a failure to apply for and have the com- "pensation assessed, when reasonable time and opportunity and "a proper tribunal are afforded for the purpose, may well be "considered a waiver."    (Cooley on Constitutional Limitations, pages 560–562.)

Francisca Cavazos, herself, could not oppose the expropria- tion on the ground of its not being of public utility.    "The "authority to determine in any case whether it is needful to "exercise the power of eminent domain must rest with the "State itself; and the question is always one of a strictly polit- "ical character, not requiring any hearing upon the facts or any "judicial determination."    (Cooley on Constitutional Limitations, 538.)

The necessity to take these lands was determined by a decree of the State of Tamaulipas, and therefore such utility must be considered as adjudged by the competent authority, and there- fore incontrovertible.

Upon these principles the defendant contends that the direct action for the land, called by the civilians the action in re-vindi- cation (*rei-vendicatoria*), does not lie.    The production of the Es- piritu Santo title, at this late date, as against the title of the defendant under the expropriation, partakes of the character of an action to recover the land in question; because, since the year 1826, this land has been undeniably out of the possession of the plaintiffs' vendors, and they themselves have proved the fact by introducing their deed, containing the recital of con-

veyances, for nearly a generation, from parties holding adversely to the Espiritu Santo. The object then of producing this Espiritu Santo title, to show the fee in them, after such a complete dispossession and loss of right, is certainly to re-establish, that is, to re-vindicate, that old grant as against the accomplished facts which have barred its operation. The fact is, that the production of this Espiritu Santo title is a challenge to the title of the defendant under the expropriation. It is a challenge also to the acts of the constituted authorities of that State, which held the true sovereignty at the time that the lands were granted to the town of Matamoros, and to whose sovereignty this State succeeded. In other words it is a challenge to the State of Texas itself.

The object of the plaintiffs, in trying this suit, was to test the validity of the Espiritu Santo grant; they knew that there was a conflicting title and they joined the issue with defendant to contest the superiority. This is the action in re-vindication of the civil law.

*W. G. Hale* and *Walton & Green*, for the defendants in error. The counsel for the defendants in error desire to sustain the following positions:

I. The title of the plaintiff, as proved in the court below, was *prima facie* good. No objection was made to it. It consisted, first, of proof of headright certificates granted to J. W. B. McFarlane and David Snively, duly assigned to Charles Stillman, and surveyed so as to cover the entire site of Brownsville, in 1848, and before any city existed; of conveyances of these surveys to the plaintiffs, and proof of their actual and continuous possession under them; second, of a grant from the Crown of Spain, made in 1781, to Salvador de la Garza, admitted by the defendants to cover the land in controversy; of transmission of title, under that grant, by devise, descent, and partition to Maria Josefa Cavazos; and of a conveyance as to the tract specially sued for, from this owner, then seized in severalty, to the plaintiff. No objection

was made on the trial, or reserved by exception, as to the sufficiency of the separate links in this derivation of title; but, on the contrary, the defendants' attempt to justify its possession rested upon the Spanish grant, and necessarily admitted that under the Spanish grant a perfect title was vested in Francisca Cavazos, through whom both parties claimed. The only question then, was whether the title of Francisca had been divested by the proceedings in Tamaulipas, and vested in the city of Matamoros. If not, the plaintiff must recover. If, on the other hand, the city of Matamoros had acquired a title, as a public corporation, and for public uses, to land in Texas, then, after the annexation of that district to Texas, the land, being freed from these uses, reverted either to the original owners or to the public domain of Texas, and if to the latter, it was appropriated by the surveys under which the plaintiff claimed.

II. The main point, then, is whether the documentary evidence of the defendants showed an expropriation of the land, including the *locus in quo*. The proceedings in Matamoros, although rather obscurely set forth, seem to have been as follows: A decree was made January 28th, 1826, by the Congress of the State of Tamaulipas, establishing the town of Matamoros, and directing the executive to " clear up the property of the " land on which it is, causing this to be indemnified according to " law, should it be private property." On February 26th, 1826, the Ayuntamiento of Matamoros ordered a survey of the lands desired, and the citation of the private owners. Doña Rita Giron agreed to the survey, but Francisca Cavazos refused, on the ground that there was no licensed surveyor. Then ensued a tedious wrangle between the alcaldes and Doña Francisca about two fields or labors on her land occupied by some relations of one of the alcaldes, in anticipation of the acquisition of the *ejidos*. The result was an order from the Governor that she should be left in possession; and that when the designation of the *ejidos* was completed, she should be preferred as to the land she desired. This order was disregarded by the alcalde. On October 15th, 1827, the Congress of the State directed that

" the government should dispose that the civil authority of
" Matamoros cause Doña Rita Giron and Doña Francisca Cava-
" zos to comply with the provisions of the Constitution and the
" laws. If notified for the second and third times, said man-
" dames refuse to appoint arbitrators for the corresponding .in-
" demnification of the lands that have to be taken for *ejidos*,
" the Ayuntamiento will proceed to the occupation and survey,
" without citing them any more." Here the matter seems to
rest until May 22d, 1835, when the Executive directed a new sur-
vey of the *ejidos*, "but that before this, it be found out by the
" Ayuntamiento if there is any private property in these lands,
" and that the owner or owners of the same be indemnified ac-
" cording to law, and that when the proceedings shall have
" been finished, an account of it be given to this superior gov-
" ernment to take whatever measures be proper." No action
was taken on this order until December 15th, 1841, when the
Ayuntamiento directed a survey, under it, and appointed Wil-
liam O'Docharty as surveyor, and ordered the citation of the
private owners. The representatives of Rita Giron, among
others, appear to have been cited ; and, on July 22d, 1841, it
was ordered that the survey commence on the succeeding day,
and this is the last that is done.

The remaining testimony consists simply of laws of Tamauli-
pas about colonization and the right of towns to acquire *ejidos*,
which do not affect this case, because a previous vested private
right had been shown, and no general authority to obtain lands
for *ejidos* could affect it.

It is very clear, therefore, that the city of Matamoras had not
acquired any title to the lands desired as *ejidos*.

III. Because, first, no survey had been made. It is too clear
to need argument that a survey is necessary in regard to private
property, before the land taken is severed from the remainder,
and specifically appropriated, and that without it the indemnifi-
cation cannot be estimated and paid. This is the primary step,
and, wanting this, the whole claim must fail for want, not only
of a title, but of locality and identity.

IV. Second, because no previous indemnification had been made to the owners of the land. This is a requisite established by general public law and expressly recognized by the legislation of Spain. (Part. III., 8, 31; II., 1, 2; Escriche Dicee. Enagenacion forzosa; Goyena, Concord. I., 152; Febrero Reformado, ed. 1852, VI., 313.) It is a principle of rigorous justice, say Escriche, Goyena, and the editors of the new edition of the Codigos Españoles, and with them agree all authors who have treated of the subject in other countries. (De Lolleau, Expropriation, II., 92; De Caudevine et Thery, Expropriation, 1.) The doctrine on this subject is briefly expressed by Hermosilla in his commentaries on Partida V., 5, 32, page 360. " Quando " lex permittit rem ob publicam utilitatem vel necessitatem " auferri, esse intelligendum justo pretio soluto et non aliter." The grant itself, in this, contains a clause providing that if part of the land granted be needed by the king for the establishment of a town, it may be taken on paying its fair value; and the same principle was again sanctioned by the 13th Article of the Constitution of Tamaulipas, which required the indemnification to be made before the property should be taken. In this case, it is clearly shown by the defendants' testimony and was admitted by the corporate authorities of Matamoros, that no payment had been made.

V. The third requisite is the issuance of a title in form, by the Governor to the city. That such a title was necessary is shown, not only by the decisions of this court (Trimble *et al. v.* Smithers, 1 Texas, 790; Jones *v.* Borden *et als.*, 5 Texas, 410), but also by the constant reference in these papers to the " further " proceedings to be had after the payment of the indemnity; and by the explicit terms of the laws of Spain and the Indies. (Part. III., 28 and 29; Rec. de Indias, IV., 13, 1; De Armas *v.* New Orleans, 5 La. R., 187, 188, and 202.)

As, therefore, there was no survey, no indemnification, and no grant, there could be no expropriation. On the 19th of December, 1836—the date designated in the act of incorporation of Brownsville—nothing had been done by the town of Mata-

moros, except to occupy, provisionally, a part of the land, subject to the right of the owners and to the result of further proceedings.

VI. Even if the public corporation of Matamoros had acquired the title, it could not have retained it after the treaty of Guadalupe Hidalgo, and the land would have either become a part of the public domain of Texas, and so subject to the McFarlane survey, or it would have reverted to the original owners, on the cessation of the public use. (Holmes *v.* Goring, 2 Bing., 76 ; McDonald *v.* Lendall, 3 Rawle, 492 ; Collins *v.* Prentice, 5 Connecticut, 39 ; U. S. *v.* Harris, 2 Sumn., 27 ; Harris *v.* Elliott, 10 Peters, 25.)

VII. As the act of incorporation of Brownsville of 1850, was repealed January 8, 1852, the defendant, at the time of the institution of the suit, was clearly without title of any kind, and could not resist a recovery. (Bass *v.* Fauntleroy, 11 Texas, 702.) The only applicability of its evidence was to the question of good faith in regard to improvements. The rule as to this is, that an occupant with notice of the better title, cannot be said to act in good faith in constructing improvements on land not his own. (Houston *v.* Sneed, 15 Texas, 310 ; Saunders *v.* Wilson, 19 Texas, 198 ; Rogers *v.* Bracken, 15 Texas.) In the present case, all the evidence produced by defendant was in possession of the city authorities before any of the improvements were commenced (see date of copies), and the council was expressly notified by the plaintiff not to build there, and was offered another site.

WALKER, J.    The defendants in error as plaintiffs below, filed their petition in the District Court on the 14th of April, 1854.

The action is trespass to try title, and the lands in controversy embrace the City of Brownsville.

The plaintiffs claim to derive title from three different sources :

First, locations and surveys.

They secondly claim to derive title from Charles Stillman and Samuel A. Belden, who, with one Jacob Mussina, appear to have purchased certain leasehold estates or emphyteutical titles, originally derived through the city of Matamoros, to a part of the lands in controversy. What interest Stillman and Belden were able to convey, does not appear from the records. Mussina's interest, whatever it was, does not appear to have been conveyed to the plaintiffs.

The third source of title claimed by the plaintiffs is a grant for near sixty leagues of land, known as the "Espiritu Santo" grant, made by the viceroyalty of Spain, in the year 1781, to one José Salvador de la Garza; and they exhibit a deed from Doña Maria Josefa Cavazos, for an uncertain interest in the Espiritu Santo grant.

The defendant below plead "not guilty;" and in bar of the action,

*First.* The statute of limitations of ten years, under the acts of the Republic of Texas, of February 5th, and March 17th, 1841.

*Second.* The statute of limitations of three years under title.

*Third.* The statute of limitations of three years, under color of title.

*Fourth.* The plea of prescription of ten years, and,

*Fifth.* Claim for improvements made in good faith at least one year before commencement of suit.

As is stated, to save trouble and expense, counsel admitted the title of the Espiritu Santo grant to the premises in question, down to and in Francisca Cavazos, previous to and at the time of the appropriation asserted by the defendant; and also that certain depositions taken in other causes named in the record should be used without exception in this case.

Plaintiffs have attempted to make out their title in the following manner:

*First.* Locations and surveys, with oral evidence.

*Second.* Stillman and Belden's deed to plaintiffs for a portion of the premises.

*Third.* Oral evidence, tending to prove title in Madam Cavazos to a portion of the "Espiritu Santo" grant.

*Fourth.* Parol evidence, to prove possession under the Espiritu Santo title.

*Fifth.* A translation of the original grant to José Salvador de la Garza.

*Sixth.* A document purporting to be the will of Maria Francisca Cavazos, one of the devisees of the Espiritu Santo grant, and also certain proceedings in partition, and a division of the land by some of the heirs and claimants of said grant.

*Seventh.* A deed from Madame Cavazos and her husband, Rafael Garcia Cavazos, to the plaintiffs.

The plaintiff in error, to defeat the action, and make out a title, offered:

*First.* Certain proceedings of the Corporation of the city of Matamoros, made in the year 1826 and subsequent thereto, condemning or expropriating, for public use, among other lands and premises, those in controversy, which appear by these public acts to have been appropriated and declared the *Ejidos* of the city of Matamoros; it appearing also, that the city of Matamoros was incorporated under a charter granted by the State of Tamaulipas.

*Second.* An ordinance of the city of Matamoros, prescribing the manner of holding labors.

*Third.* An act to incorporate the City of Brownsville, passed by the Legislature of the State of Texas on the 24th of January, 1850, the first section of which reads as follows:

"SECTION I.—Be it enacted by the State Legislature of the "State of Texas: That the citizens of Cameron county, in the "State of Texas, residing within the limits of that section of "territory situated and lying on the left margin of the Rio "Grande, in the county of Cameron aforesaid, formerly a part "of the town tract of four leagues of land (*ejidos*) of the city "of Matamoras, in the Republic of Mexico, be, and they are "hereby declared a body politic and corporate, by the name and "title of the 'City of Brownsville,' and by that name may sue

"and be sued, implead in all courts and in all actions and mat-
"ters whatsoever, and by the same name may, by deed of gift,
"grant, or purchase, hold and dispose of any estate, real or per-
"sonal, within the limits of said city, for the use of the cor-
"poration, and may have a common seal, which they may alter
"and change at their pleasure; and all the right, title, and in-
"terest of the State of Texas, in and to all the land included
"within said tract, that was owned by the town of Matamoros,
"on the 19th day of December, 1836, shall be and is hereby
"relinquished to the Corporation of the City of Brownsville,
"and their successors in office, in trust for the use and benefit
"of said city; provided, this act shall not impair private
"rights."

*Fourth.* Oral evidence to prove occupation and improvements under the grant from the State.

*Fifth.* A contract for the construction of a market-house.

*Sixth.* Oral evidence, to prove possession in the city of Matamoros from 1826 to 1846.

Plaintiffs, by way of rebuttal, offered an act of the Legislature of the State of Texas, approved January 8th, 1852, repealing the first charter of the City of Brownsville, passed on the 24th January, 1850. The act of January 8th, 1852, did not take effect until the 1st day of March of the same year.

The plaintiffs also offered an act of the Legislature confirming the title of the Espiritu Santo grant, passed on the 10th day of February, 1852.

On the trial the defendant offered the testimony of two witnesses, Longoria and Alcala, for the purpose of proving user, occupation, and jurisdiction, in the city of Matamoros, over the lands in controversy, from 1826 to 1846.

This evidence was objected to. The objections were sustained by the court. Other exceptions were taken to the ruling of the court on the trial, none of which we deem it important to notice other than that which applies to the charge given to the jury.

There was a verdict and judgment for the plaintiffs below.

32

The defendant moved for a new trial, which motion was over-ruled; and the case is brought to this court on writ of error.

We have before us a badly-arranged transcript of four hundred pages, with an assignment of errors, which, for all practical purposes tending toward the labors of the court, might as well have been left out. Yet it is by no means difficult to find, in the charge of the court alone, error abundantly sufficient to reverse the judgment. Thus, the court tells the jury: "The ti- "tles shown by the plaintiffs amount to a good title in the "plaintiffs to the lands in the petition described."

"The titles!" Which of the titles? The plaintiffs claim to derive title from three different sources, each of which would seem to call for a different quantity of land. Which of them, then, is good? If either one, the other two are bad; and the court, if intending to instruct the jury that either one of the titles was good, should have pointed out which one, that the jury might ascertain how much land the plaintiffs were entitled to recover under their good title. The court certainly did not intend to say that all three of the titles taken together made a good title; for this tripartite fraternity was at war with itself, and the three titles could not stand together.

The jury were evidently misled by this charge. Indeed, the court left little or nothing for the jury to do in the premises. Such a charge robbed the jury of its province, and decided the case; and we think decided it erroneously, as a proper examination of the law will show.

The court not only erred in the charge given, but it erred in refusing that offered by defendant's counsel. The land in controversy was not open to location, and therefore the title claimed through locations and surveys was worthless.

Up to 1846, when the victorious arms of the United States established the jurisdiction of the State of Texas over the land in controversy, it had been held in actual sovereignty by the State of Tamaulipas; which State, by the authority of its public laws, had granted the fee, accompanied by a municipal jurisdiction, to the city of Matamoros. This was done in the year 1826,

and the city of Matamoros continued to hold the fee· and exercise jurisdiction over the land until she was deprived of it by the terms of the treaty of Guadalupe Hidalgo.

She then certainly lost her municipal jurisdiction, but was she divested of the fee?

She had been incorporated under the laws of the State of Tamaulipas as a city, and as such body corporate and politic she could hold real and personal property in her own right, and did hold the *ejidos*, subject only to the emphyteutical titles which she granted out to individuals. But Texas, as early as the 19th of December, 1836, had declared the lands in question to be within her jurisdiction. She never made good that jurisdiction by actual occupation and the exercise of sovereignty, until 1846; but it may be a question whether, by successful conquest in 1846, her sovereignty does not relate back to the 19th of December, 1836, the date of the act by which she declared it so.

But as this question belongs more to the province of the statesman than the jurist, and is, in our view, unnecessary to the decision of the case, we forbear discussing it further, though we admit at one time it may have been decisive of this case. On the 30th January, 1826, the government of the State of Tamaulipas erected the " Congregation of Refugio " into the town of Matamoros, and ordered that the Executive should determine whatever was necessary to clear up the property to the land. on which said town was situated, causing indemnification to be made for private property.

We have examined the case of Mussina *v.* Alling *et al.*, 11 L. An., 573 *et seq.*, in which we find a complete history of the matter in controversy in this case, together with sound rules of law governing it in its essential features; and we refer to the case for the authority of our opinion as to the invalidity of the plaintiff's title. We have said that the plaintiffs had no title by virtue of their locations and surveys. A mere certificate of entry, which is equivalent to the certificates of location, does not vest the title in the holder of the certificate; it still remains in the

sovereignty.   Such certificates may be witnesses of an inchoate title, but they are nothing more.   (See Wilcox *v.* Jackson, 13 Peters, 513.)

The plaintiffs conclusively show the invalidity of their titles by location and survey, by introducing their labor titles; the one utterly inconsistent with the other.   But what were these labor titles?   Mere lease-hold estates, granted for a term of years; and the holders of them could not convey a fee simple estate, and by attempting to do so, they forfeited the rights which they had, and the plaintiffs took nothing by the deeds.

What, then, of the attempt to deraign title from the viceroy of Spain, through the heirs·and devisees of José Salvador de la Garza?  · Whatever title the heirs of José Salvador de la Garza may have had to the *ejidos* of Matamoros, now the lands in controversy, was divested by the acts of expropriation; and whether Madam Cavazos ever received the price of the land as fixed by the arbitrators, is a matter totally immaterial to this case.   It·is admitted in the opinion of Mr. Justice Swayne, that the southern boundary line of the Espiritu Santo grant followed the meanderings of the Rio Grande.   The lands in controversy were then embraced in that grant; but we do not think that any title to the *ejidos* remained in the heirs or devisees of José Salvador de la Garza, after the expropriation made by the city of Matamoros under the laws of the State of Tamaulipas.

On the 24th of January, 1850, the Legislature of the State of Texas incorporated the City of Brownsville; and in the terms already quoted in this opinion, granted the *ejidos* or lands now in controversy to the city.

This act of the Legislature was equivalent to a judicial forfeiture on office found.   (See 5 Wallace, 267 and 268.)   But it is claimed this act was subsequently repealed by an act of January 8th, 1852, repealing so much of the first charter of the City of Brownsville as the Legislature had power to repeal.

But the act of January 24th, 1850, was in the nature of a public grant, conveying a present beneficial interest ; and therefore could not be repealed by the Legislature. (See Rice v. The Minnesota N. W. R. R. Co., 1 Black, U. S. R., 358 ; State Bank of Ohio v. Knoop, 16 How., 369–380 ; Dodge v. Woolsey, 18 Howard, 331 ; Trustees of Dartmouth College v. Woodward, 4 Wheaton, 518–650 ; Fletcher v. Peck, 6 Cranch, 87 ; State of New Jersey v. Wilson, 7 Cranch, 164 ; Planters' Bank of Mississippi v. Sharp, 6 How., 301–327 ; Gordon v. Appeal Tax Court, and Cheston v. Appeal Tax Court, 3 How., 133 ; Woodruff v. Trapnall, 10 How., 190 ; Jefferson Branch Bank v. Skelley, 1 Black, 436–449 ; Bridge Proprietors v. Hoboken Company, 1 Wall., 116 ; The Binghamton Bridge, 3 Wall., 73, 74 ; Hawthorne v. Califf, 2 Wallace, 10 ; Van Hoffman v. The City of Quincy, 4 Wall., 549, 550 ; McGee v. Mathis, 4 Wall., 143 ; Home of the Friendless v. Rouse, 8 Wallace, 430 ; Railroad Company v. McClure, 10 Wallace, 51.)

If the law were otherwise, still the plaintiffs could not claim that they have derived any benefit from the legislation of the State. The act of January 8th, 1852, did not take effect until the 1st day of March of the same year. An act passed on the 10th day of February, confirming the title to the Espiritu Santo grant, could not affect the title of the city of Brownsville to the land in controversy. Mr. Justice Swayne, in the case of Cavazos v. Trevino, says: "According to the rule of the " Spanish law, where a survey is intended to bound on a stream, " a straight line was run from the beginning point to its termina- " tion at the slough ; and the quantity of land in the bends of " the river was ascertained by computation without actual " measurement." This, then, would indicate that the Rio Grande was the southern boundary line of the old Spanish grant, made to José Salvador de la Garza. But the title which descended to his heirs was undoubtedly divested by the public acts of the Mexican authorities. We append to this opinion a

copy of the map used in the Cavazos and Trevino case, for the purpose of illustration.

As to the validity of the acts of a foreign government, whether political or judicial, we find no exception to the authority as laid down by our own ablest writers on international law, to the effect that that government or forum must be regarded as the best judge of its own acts. (See Halleck on International Law, p. 117; Wheaton, p. 161; Story, p. 165;

and see also, Powell *v.* De Blane, 23 Texas, 76; Elmendorf *v.* Taylor, 10 Wheaton, 152.)

In the latter case Chief Justice Marshall said : "No court " in the universe which professed to be governed by principle, " would, we presume, undertake to say : 'the courts of Great " ' Britain or France, or of any other nation, had misunder- " ' stood their own statutes;' and therefore erect itself into a " ' tribunal to correct such misunderstandings. " (See also the case of Hancock *v.* McKinney, 7 Texas, p. 442, 3.) We will, therefore, not undertake to say that the acts of the Ayunta- miento of Matamoros, the Governor and the Legislature of the State of Tamaulipas, in making the expropriation of the lands in controversy for public use in 1826, were not in all respects regular and valid.

But we deem it wholly unnecessary to follow the very able and learned argument of counsel through all the rami- fications which they appear to ascribe to this case. Their learning has invested the case with great interest to the court.

We think the whole case capable of a simple solution. The State of Texas in 1836 declared herself the sovereign over the land embraced in this controversy. Prior to the revolution there does not appear to have been any controversy about boundary lines between Texas and her sister States of Mex- ico, at least so far as relates to the matter herein involved.

After the State became one of the United States her claim to her asserted boundary was made good by an appeal to arms and the subsequent treaty of Guadalupe Hidalgo. We be- lieve the State had a perfect right by inquest of office to forfeit all right or rights whatsoever, claimed by the government of Tamaulipas and the city of Matamoros ; and that she has done so, and by the act of her Legislature passed on the 24th of Jan- uary, 1850, she vested in the city of Brownsville a good and indefeasible title.

We refer to the following authorities in support of our opin- ion, and for the purpose of showing how the Supreme Court

of the United States has treated kindred questions to those involved in this case : Townsend *et al. v.* Greely, 5 Wall., 326 ; The United States *v.* Repentigny, 5 Wall., 211 ; United States *v.* Rocha, 9 Wall., 639 ; Bennett *v.* Hunter, 9 Wall., 336 ; Beard *v.* Fedry, 3 Wall., 478.

The judgment of the District Court must be reversed and the cause remanded, to be proceeded with in accordance with this opinion.

After the rendition of the foregoing opinion, the counsel for defendants in error moved for a rehearing. In support of their motion they filed a full and very able argument; of which the most pertinent portions are here inserted.

*W. G. Hale,* and *Walton & Green,* in behalf of their motion for a rehearing.

I. If it should be allowable, under the doctrine of this court, to discuss the question of the actual—not the legal—expropriation of the lands in question, we would refer to the 13th Article of the Constitution of the State of Tamaulipas, which is as follows :

" Neither the Congress nor any other authority can take the " property, even that of the least importance, of any private " person. When, for the object of a known public utility, it " may be necessary to take the property of any one, he shall be " first indemnified upon the examination of arbitrators, appointed " by the Governor of the State and the interested party."

And it is well settled and consonant with reason, that until the survey and payment for the lands expropriated shall be made, neither party is bound, and the city may abandon its claim without any recourse on the part of the original owner. That is to say, no right is vested in either side until the final decision and payment by the expropriating party. In other words, the contract cannot be unilateral, but must be binding upon both sides. So it has been held, that when before survey and compensation, a city ceases to insist upon its claim and relin-

quishes the property of which it had taken preliminary possession, or fails to condemn it, the private owners resume their possession without claim against the city, except for its temporary occupancy. (Stacey *v.* Vermont Central R.R. Co., 27 Ver., 39 ; Hetfield *v.* Central R.R. Co., 5 Dutch., 571 ; Hudson River R.R. Co. *v.* Oatwater, 3 Landf., 689 ; Graff *v.* Mayor of Baltimore, 10 Md., 544 ; Water Commissioners of Jersey City, 31 N. J., 72 ; Baltimore *v.* Susquehanna R.R. Co., 10 How., 395.)

II. Supposing, however, the expropriation to have been made and the compensation to have been paid, to whom does the benefit result ? Does the interest and ownership of a Mexican authority apply to a stranger ? In other words, can a third party take advantage of this forcible proceeding without a privity with either party ? Can the present city of Brownsville, incorporated in 1853, assume that acts done under another sovereignty, twenty years ago, and with the view of aiding a different community, have resulted in vesting a title in its favor or in the State of Texas? Is there any reason, *a priori*, why Brownsville should assume the claims of Matamoros rather than the city of Austin ? The reply to these obvious questions seems to be that the State of Texas has been invested with the rights, whatever they were, of the city of Matamoros, and has transferred them to Brownsville. But however true it may be that the State of Texas has succeeded to the public domain of the State of Tamaulipas, there is nothing to show why it should claim a succession to the benefits of the municipal organization of that State, or adopt the arrangements made in virtue of its laws. If it be said that this is a right of a successor sovereignty, then we must transport, not only the fact, but the right qualifying that fact existing under the former government. We cannot avail ourselves of results, without subjecting ourselves to corresponding obligations. In other words, it cannot be correct or logical to adopt wrongful or contingent acts of another State, not in accordance with our own laws, merely because they will benefit us and let us reap the advantages of an unfinished wrong. If, for instance, the State of Tamaulipas had as-

serted its right to all the land between the Rio Grande and Nueces as the private domain of the State, this unfounded assertion would not have authorized the State of Texas to appropriate those lands without regard to the Spanish grantees. This self-evident proposition has been so often determined that it is almost useless to cite authorities.

But if it were not so, it would still follow that the only source of the right of the city of Brownsville to succeed to the claims of the city of Matamoros is through the bounty and the right of the State of Texas. If the property in the soil never actually passed from the original owners, it could not be transferred to the State of Texas; and if it did so pass it would not necessarily vest in the State of Texas, after the special use for which it was destined had lapsed. In short, the acts of Matamoros were for its own benefit, and must be confined to that, and not counted in favor of an alien State government. The private inhabitants of Matamoros have a far better right to apply to the courts of this country for the appointment of a trustee to hold these lands for their benefit than the citizens of a different municipality.

III. The opinion, however, goes farther than has thus far been indicated, and it decides in effect that, whether Matamoros ever acquired an actual legal title to this land by virtue of a complete condemnation, the fact of the occupancy and of the acquiescence and authority by the officers of Tamaulipas form such an evidence of right as must be respected in this State; and that the action of the Legislature in conferring a title to this property on the city of Brownsville in 1850 was a virtual recognition of the proceedings taken by Matamoros to condemn it as *ejidos*.

In reply to this, we desire to say in the first place that whatever may have been the action of the city of Matamoros itself, as an interested party, can have no effect here, because the acts of that city cannot create a right in its favor; and, in the second place, that the right of the city of Matamoros was made dependent by the last order in those proceedings upon the action of the

Executive of the State of Tamaulipas, which was never made; and, in the third place, that the authority and title of Matamoros ceased and gave way to the State of Texas upon the treaty of Guadalupe Hidalgo. It should be borne distinctly in mind that the State of Tamaulipas has never approved of the usurpation of Matamoros, but on the contrary, as appears by the record in another cause, it has emphatically disavowed and censured the action of that city. (Cavasos v. Stillman, U. S. Supreme Court, not reported.)

IV. If it be true, as thus far stated, that the legal title to this land was never acquired by Matamoros, then the whole defense fails; but if it were so acquired before 1836, it does not follow that the city of Brownsville can set it up. If the defendant below intended to use it as an outstanding title to prevent a recovery, it must be shown that such title was vested in an existing person competent to sue. It is not contended that the city of Matamoros has such a present right; and it is therefore necessary for the defendant to maintain, not that there is simply an outstanding title in others, but that it is vested in itself. The view this court appears to have taken, rests upon three points: first, that the title was legally and actually vested in the city of Matamoros; second, that such title was legally transferred to the State of Texas by the change of sovereignty; and third, that it was conveyed by the State to the city of Brownsville by the act of 1850. To these positions must necessarily be added this: that the investiture under the act of 1850 was of such a nature that it could not be rescinded by the repealing act of 1852. The first point—that the title to the property had been vested in Matamoros, has been already sufficiently discussed. The second—that the title passed to the State of Texas, requires thorough analysis. It is the common law view, as followed in most of our States, that property dedicated or acquired for public use, reverted to the original owners upon the cessation of that use. Another and more recent, although doubtful theory, is that the property thus acquired, reverts not to the original owners but to the State, as *parens patriæ*; but this is

necessarily coupled with the restriction that it was acquired under and by the authority of the State. In this case, the State of Texas do not authorize the acquisition, but received the land, under the treaty of Guadalupe Hidalgo, with the requirement, of equal dignity, to respect the right of private owners. The State was not the donor, but the successor trustee of public and private interests together. Adopting this latter view, which is the most favorable to the defendant below, doubtful though it may be, it will follow that, if in fact the land had become the property of Matamoros, the legal title passed to the State of Texas when the authority of Matamoros ceased. But it does not follow that thereby the rights of the individual inhabitants of Matamoros ceased, or that the State of Texas received it unincumbered by the charitable uses for which it was acquired. One of two things must be conceded: first, that the State had unrestricted power of disposition of this property, or second, that the State received it subject to the uses for which it was before destined. If the latter, the State had no more power to grant it again to the city of Brownsville than the city of Matamoros had to do so. If the former, then the grant by the confirming act of 1852 of all the right, title, and interest of the State to the heirs and assigns of José Salvador de la Garza passed the unrestricted title to the plaintiffs below.

V. If the foregoing suggestions shall not appear to the court to be of the weight which we ascribe to them, we desire to call the attention of the court to the fact that the grant, if it may so be called, to the city of Brownsville by the act of 1850 was repealed by the act of 1852, taking effect on the 1st of March of that year; and that by an act taking effect on the 17th of April, 1852, all the right, title, and interest of the State was granted to the vendors of the defendants in error.

In the opinion of the court, the distinction between municipal or public corporations and private corporations has not been so closely noticed as the facts of this case demand. The principle and the doctrine as to both are exceedingly simple. A private corporation is a private person. A municipal corporation is an

instrument of the general government of the State, like the
Governor, Treasurer, or any other officer, and has no vested
rights that cannot be recalled by the government which con-
ferred them.   Nothing is better settled than that the Legisla-
ture of the State has a right to abolish not only the bounty, but
the agency which it has given to a county or city corporation.
This doctrine, well established, does not interfere with the right
of the individual citizens to perpetuate the donations or the pur-
chases which have been made for the corporation from private
parties, but it deprives the corporation of the right to assert a
vested claim to public benefactions.

(Angell & Ames on Corporations, 9th ed., Section 31; Cooley
on Constitutional Limitations, 2d ed., 191; Shearman & Redfield
on Negligence, Sections 121, 122; St. Louis v. Allen, 13 Mo.,
400; Coles v. Madison, Breese, 115; Richland county v. Law-
rence county, 12 Ill., 1; Trustees of Schools v. Tatman, 13 Id.,
27; Robertson v. Rockford, 21 Id., 1; People v. Power, 25 Id.,
187; State v. Cowan, 29 Mo., 330; Granby v. Thurston, 23
Conn., 416; Sloan v. State, 8 Blackford, 361; Langworthy v.
Dubuque, 16 Iowa, 271; Atchison v. Bartholow, 4 Kansas, 124;
People v. Draper, 15 N. Y., 532; Aspinwall v. Commissioners,
22 How., 364; People v. Morris, 13 Wend., 325; People v.
Pinkney, 32 N. Y., 377; Harrington v. Rochester, 10 Wend.,
547; Montpelier v. East Montpelier, 29 Vt., 12; Montpelier
Academy v. George, 15 La. An., 406; Harrison v. Bridgeton,
16 Mass., 16; Weeks v. Milwaukee, 10 Wis., 242; People v.
Wren, 4 Scam., 273; East Hartford v. Hartford Bridge Co., 10
How., 511; McKim v. Odain, 3 Bland., 407; Marrella v. Fear-
ing, 4 Ohio (Hamm.), 427.)

And see especially on this particular case Bass v. Fauntleroy,
11 Texas, 698, which is conclusive of the whole question.

A donation made by the State itself to a municipal organiza-
tion may be recalled at pleasure, because the municipality is
nothing but an agency itself.

Private donations from individuals to a municipal corporation
stand upon an entirely different footing, and cannot be affected

by any action of the State. If the municipality is abolished, a court with equity jurisdiction will enforce the donation by appointing a new trustee. As to this general doctrine we refer to the foregoing authorities.

This whole case may be summed up in a few words. It is admitted that the rightful title to this property was vested in Francisca Cavazos, the ancestress of the plaintiffs' vendors. The burden of proof, therefore, is upon the defendants below to show a title out of Francisca, and this they attempt to do by a condemnation for the city of Matamoros. If this condemnation is defective; if the compensation has not been paid; if the proceedings have not been ratified by the State authorities, then the whole defense fails. If after that the State inherits the property, grants it to the city of Brownsville, resumes it, and grants it again to the heirs of José Salvador de la Garza, then the original owners resume their pristine title, and can assert it against the world.

WALKER, J. We have been greatly gratified and instructed on the re-hearing of this case. Few cases are conducted with more profound ability and learning on the part of counsel.

It was a matter of no small embarrassment to us that we had to grapple in the first place with this case, unaided by oral arguments or even a brief on the part of the defendants in error. We did not, however, risk an opinion until we thought we comprehended all the material questions arising in the case; and after the very able argument and thorough exposition of the whole case to which we have listened at bar, we congratulate ourselves in believing that we committed no material blunder in our former opinion; and we therefore affirm it without further comment on the case, except that instead of remanding, we dismiss the case.

Reversed and dismissed.